IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

GILBERTO GARCIA-QUINTANA, *Appellant*.

No. 1 CA-CR 12-0565
FILED 3-25-2014

Appeal from the Superior Court in Maricopa County
No. CR2012-103830-003
The Honorable Susanna C. Pineda, Judge

**AFFIRMED AS MODIFIED; VACATED IN PART**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Tennie B. Martin
*Counsel for Appellant*

**OPINION**

Presiding Judge Andrew W. Gould delivered the opinion of the Court, in which Judge Peter B. Swann and Judge Jon W. Thompson joined.

**G O U L D**, Judge:

¶1         Gilberto Garcia-Quintana ("Defendant") appeals from his conviction and sentence for sale or transportation of marijuana, a class two felony.  Defendant argues the court improperly admitted drug courier profile evidence.  Because we conclude the evidence was properly admitted as modus operandi evidence, we affirm as modified, vacating the order Defendant pay for the cost of DNA testing.

## Facts and Procedural History[1]

¶2         Shortly before midnight, Border Patrol agents using infrared equipment spotted 11 men walking in the desert near Gila Bend, Arizona. A short time later, agents started tracking the group's foot sign,[2] which eventually led to ten makeshift backpacks abandoned in the desert.  The backpacks each contained approximately 50 pounds of marijuana, for a total of 477 pounds.  The agents continued to track the group, and about a mile from the backpacks they discovered Defendant and three other men hiding under a blanket.

¶3         Defendant was arrested and charged with one count of sale or transportation of marijuana.  Defendant was tried and convicted, and sentenced to a presumptive term of imprisonment of 3.5 years.  Defendant timely appeals.

## Standard of Review

¶4         Prior to trial, Defendant filed a motion in limine requesting the court to preclude evidence of the usual practices of drug dealers and whether Defendant fit a drug courier profile.  The motion did not identify any specific evidence or testimony to be precluded.  At oral argument, the prosecutor explained that he planned to elicit testimony about the general modus operandi of drug trafficking organizations.   Remarking on the distinction between inadmissible drug courier profile evidence and admissible modus operandi evidence, the court stated, "Until I hear the

---

[1]        "We construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant." *State v. Greene*, 192 Ariz. 431, 436, ¶ 12, 967 P.2d 106, 111 (1998) (citation omitted).

[2]        Agent Curiel testified that "foot sign" is a tracking term that refers to any disturbances on the ground or the physical environment, such as footprints or broken branches, that do not occur naturally.

question, however, I won't know whether or not a question actually fits into asking for drug courier profiling, which is not admissible, and [modus operandi], which is." Accordingly, the court reserved any ruling until trial, and stated that it would rule on "a question-by-question basis." However, during trial Defendant did not object to any of the testimony he now claims was inadmissible drug courier evidence.

¶5        "[W]here a motion in limine is made and ruled upon, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial." *State v. Anthony*, 218 Ariz. 439, 446, ¶ 38, 189 P.3d 366, 373 (2008) (quoting *State v. Burton*, 144 Ariz. 248, 250, 697 P.2d 331, 333 (1985)). However, when the court does not rule on a motion in limine, the motion does not preserve a defendant's objection(s) if he fails to subsequently object at trial. *State v. Lujan*, 136 Ariz. 326, 328, 666 P.2d 71, 73 (1983) (holding that failing to make a record as to the disposition of the motion in limine and failing to object at trial waived any error).

¶6        Because the court never ruled on Defendant's motion in limine and Defendant did not object at trial, Defendant has "not properly preserved these issues for appeal absent fundamental, prejudicial error." *State v. Perez*, 233 Ariz. 38, 43-44, ¶ 21, 308 P.3d 1189, 1194-95 (App. 2013). We therefore review for fundamental error only. *State v. Henderson*, 210 Ariz. 561, 567-68, ¶¶ 19-20, 115 P.3d 601, 607-08 (2005). Under a fundamental error standard, the defendant must demonstrate not only that fundamental error occurred, but also that the error prejudiced the defendant. *Henderson*, 210 Ariz. at 567-68, ¶ 20, 115 P.3d at 607-08.

**Discussion**

¶7        At trial, Defendant asserted he had never carried any of the marijuana backpacks and was not part of the drug smuggling group. Rather, his defense was that the agents apprehended him while he was crossing the desert to find work in the United States.

¶8        Because Defendant was not found in actual, physical possession of the marijuana, the State's case against him was largely circumstantial. The agent observing the suspected smuggling group radioed the group's GPS coordinates to nearby agents. Within 20 minutes, the agents arrived at the GPS location. Using a tracking dog, they started tracking a group of 11 men. After following the trail for approximately five miles, the agents discovered the ten abandoned bundles of marijuana. They also observed a trail leading away from the marijuana.

¶9        The agents and the tracking dog continued to follow the trail for about a mile, when the dog led them to Defendant, who was hiding under a blanket with three men.  Two of the four men – the agents could not recall which of the four – were wearing shoes that matched the foot sign on the trail.  The agents did not compare the foot sign with the shoes Defendant was wearing.  The group had no food, water, or personal items.  The agents later took pictures of Defendant showing that he had marks on his shoulders and lower back that were consistent with him carrying something very heavy, *e.g.*, one of the makeshift backpacks.[3]

¶10        During its case-in-chief, the State also presented expert testimony from several agents and law enforcement officers about the methods used by drug trafficking organizations to smuggle drugs across the desert.  Defendant argues this expert testimony was inadmissible drug courier profile evidence.

## I.    Modus Operandi and Drug Courier Profile Evidence

¶11        "A drug courier profile is a loose assortment of general, often contradictory, characteristics and behaviors used by police officers to explain their reasons for stopping and questioning persons about possible illegal drug activity."  *State v. Lee*, 191 Ariz. 542, 544, ¶ 10, 959 P.2d 799, 801 (1998).  The profiles consist of an "'informal compilation of characteristics' or an 'abstract of characteristics' typically displayed by persons trafficking in illegal drugs."  *Id.* at 544-45, ¶ 10, 959 P.2d at 801-02 (internal citations omitted).  The profiles are based on the experience of officers who have investigated illegal drug activity, and consist of a wide variety of factors, such as an individual's age, clothing, jewelry, luggage, use of cash to make purchases, nervous or unusually calm behavior, and plane travel from "drug source" cities.  *See* Jay M. Zitter, Annotation, *Admissibility of Drug Courier Profile Testimony in Criminal Prosecution*, 69 A.L.R. 5th 425 (1999 & Cum. Supp.) (compiling cases discussing drug courier profiles); Kimberly J. Winbush, Annotation, *Propriety of Stop and Search by Law Enforcement Officers based Solely on Drug Courier Profile*, 37 A.L.R. 5th 1 (1996 & Cum. Supp.) (same).

---

[3]        During his trial testimony, Defendant admitted the marks were from carrying a very heavy backpack containing food and water across the desert from Mexico.  However, Defendant denied carrying a backpack containing marijuana.

¶12        While drug courier profile evidence may be admissible "in the context of suppression and probable cause hearings, where law enforcement's justification for a stop, arrest, or confiscation is at issue," it is not admissible as substantive proof of guilt at trial. *Lee*, 191 Ariz. at 545, ¶ 11, 959 P.2d at 802. Courts have generally precluded police officers from testifying at trial that, based on their training and experience, a particular defendant "fits" the profile of a drug dealer or drug trafficker. Such testimony is inherently prejudicial because it suggests to the jury that "because someone shares characteristics—many of them innocent and commonplace—with a certain type of offender, that individual must also" be guilty. *Id.* at 545, ¶¶ 12, 14, 959 P.2d at 802; *see also State v. Cifuentes*, 171 Ariz. 257, 257, 830 P.2d 469, 469 (App. 1991) (stating that the "use of profile evidence to indicate guilt . . . creates too high a risk that a defendant will be convicted not for what he did but for what others are doing").

¶13        "Unlike drug courier profile evidence, modus operandi evidence is . . . properly admitted to assist the jury in understanding the modus operandi of a drug trafficking organization." *State v. Gonzalez*, 229 Ariz. 550, 554, ¶ 13, 278 P.3d 328, 332 (App. 2012). Modus operandi evidence focuses on the usual patterns or methods used by a criminal gang or organization to commit a crime. *See, e.g.*, *United States v. Sepulveda-Barraza*, 645 F.3d 1066, 1069 (9th Cir. 2011) (testimony that drug traffickers do not typically use unknowing drivers to transport drugs was admissible to show the methods and techniques employed by drug trafficking organizations); *United States v. Murillo*, 255 F.3d 1169, 1178 (9th Cir. 2001) (testimony that drug trafficking organizations do not entrust thousands of dollars in drugs to unknowing couriers was admissible as evidence concerning the structure and operation of such organizations), *overruled on other grounds as recognized in United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007). Because crimes involving a criminal organization may be complex and involve multiple individuals, the role each person plays in committing the crime is most likely beyond the knowledge of the average juror. *United States v. Montes-Salas*, 669 F.3d 240, 250 (5th Cir. 2012) (stating that testimony about how a trafficking operation works, the roles of guides, drivers, etc. is "legitimate background testimony"). Thus, a qualified law enforcement officer may provide expert opinion testimony regarding the modus operandi of a criminal organization to explain how a person's actions may indicate their active participation in a crime. *United States v. Cordoba*, 104 F.3d 225, 229 (9th Cir. 1997) (A qualified expert witness may provide opinion testimony regarding the operation of drug trafficking organizations if it "will assist the trier of fact in understanding the evidence or determining an issue.").

¶14 While expert testimony concerning the structure and methods used by drug trafficking organizations is admissible, the expert may not provide an opinion comparing the modus operandi of such an organization with the conduct of a defendant in a particular case. *See United States v. Doe*, 149 F.3d 634, 637 (7th Cir. 1998) (approving expert explanation of common practices of drug traffickers when the jury is "left to compare that information to the facts of th[e] case and [defendant's] own behavior"). Rather, it is the province of the jury to determine whether a defendant's conduct fits within the modus operandi of a drug trafficking organization. *United States v. Morin*, 627 F.3d 985, 995 (5th Cir. 2010) (stating that an expert may analyze the facts but may not offer an opinion on the ultimate legal issue in the case "by offering a direct opinion as to the defendant's mental state or by giving the 'functional equivalent' of such a statement"); *cf. State v. Moran*, 151 Ariz. 378, 381-82, 386, 728 P.2d 248, 251-52, 256 (1986) (stating that expert testimony regarding the general behavioral characteristics of child abuse victims is admissible, but testimony that a victim's behavior is consistent with such characteristics is inadmissible).

¶15 The admissibility of modus operandi testimony is a fact-intensive inquiry, and the trial judge must carefully consider the facts of each case. We stress that modus operandi testimony is, at its core, generalized expert testimony about the patterns of a criminal organization, rather than testimony about the conduct of a defendant in a particular case. Thus, by way of example, a qualified officer may testify that a gang of professional pickpockets typically assigns one member of the gang to distract the victim by staging an argument or bumping into the victim. This might help a jury understand why a defendant, who created the distraction but did not actually pick the victim's pocket, was a participant in the crime. In contrast, if the officer opined that the defendant's young age, clothes, demeanor and gestures at the scene of the crime showed that he fit the profile of a pickpocket, such testimony would be inadmissible profile evidence.

## II. Analysis of Expert Testimony

¶16 The State elicited testimony from several law enforcement witnesses concerning the methods used by drug trafficking organizations to transport marijuana across the desert. Agents Dawson and Curiel testified about the routes used by drug traffickers to cross the desert. Agent Curiel testified that his unit regularly watches the area where

Defendant was found, because he and his fellow officers have observed a significant amount of foot sign in the area.[4]  Agent Dawson testified that drug traffickers often use the area to avoid Border Patrol.  Agent Dawson testified that drug traffickers are aware that the area is used as a military bombing range, and that Border Patrol agents will not enter this range during live bombing, which occurs approximately five days a week.  In addition, Agent Dawson testified that the path through the subject area allows drug traffickers to avoid a nearby Border Patrol checkpoint.

¶17        Agent Curiel testified about the methods drug traffickers use to avoid being tracked by Border Patrol.  Agent Curiel testified that drug traffickers will often wear "carpet booties" to disguise their foot sign in the desert.  These booties consist of pieces of carpet slipped over a shoe, and have the effect of leaving little or no foot sign.  Agent Solosabal testified that the tracks leading both to the marijuana bundles and Defendant included tracks made by carpet booties.

¶18        Agent Curiel explained that in his experience drug traffickers carrying marijuana in backpacks most often travel in groups of 2-20 people.  This experience was one of the factors he relied upon in determining that the group of 11 people he observed walking across the desert may have been drug traffickers.

¶19        Agents Solosabal and Curiel testified about the typical backpacks used by drug traffickers and the usual contents of these backpacks.  When Agent Curiel first spotted the group, he observed that in contrast to the infrared heat signatures emitting from their bodies, there were large rectangular "cold spots" on their backs.  The "cold spots" indicated the men were carrying large backpacks.  Agent Curiel explained that the size and shape of the backpacks he observed indicated the men were carrying drugs because people who are carrying food and water will typically use smaller "school-style backpacks."  He testified that the packs the agents found, which were made of blankets and ropes tied around bundles of marijuana, are typical of those used by drug traffickers.

---

[4]        On cross-examination, defense counsel asked Agent Curiel if he had "ever apprehended anyone who was walking into the United States" or "this area" that didn't have drugs on them, to which Agent Curiel answered, "I don't recall" and "I don't know." Agent Curiel also testified, however, that the area is also a high traffic area for non-drug traffic, including persons who have illegally crossed the border.

¶20      Agent Solosabal also testified that in his experience, people who are not trafficking drugs will be found with small backpacks containing food, water, and personal belongings, but drug traffickers will be found without anything, having abandoned their backpacks to distance themselves from the illegal contraband. Agent Solosabal explained that drug backpacks typically weigh 50 pounds, and one member of the group is usually designated to carry a backpack containing food and water for the group.

¶21      Maricopa County Sheriff's Office detectives also testified that the types of bundles recovered in this case are typical of the types of bundles found in drug trafficking cases. Detective DeSimone testified that he did not fingerprint the bundles because, in his experience, "people generally backpacking the marijuana bales coming across the border are not the same individuals who packaged the marijuana."

¶22      Finally, Agent Dawson explained that he photographed Defendant and the three men found with him because subjects who are apprehended trafficking narcotics into the United States will frequently have marks on their bodies from carrying marijuana laden backpacks/bundles.

¶23      The evidence in this case was properly admitted as modus operandi evidence because the agents' testimony served to educate the jury about the methods and operations of drug trafficking organizations. The agents' testimony about how drug trafficking organizations package and transport drugs in backpacks across the desert assisted the jury in understanding the methods used by drug trafficking organizations to smuggle drugs into the United States. Similarly, explaining the routes trafficking groups use to avoid being caught and that drug traffickers oftentimes wear carpet booties to disguise their foot sign in the desert explained the techniques used by drug smuggling organizations to avoid detection by Border Patrol. *Cordoba*, 104 F.3d at 229 ("If specialized knowledge will assist the trier of fact in understanding the evidence or determining an issue, a qualified expert witness may provide opinion testimony on the issue in question.") (quoting Fed. R. Evid. 702).

¶24      Additionally, the testimony in this case does not present the risk warned of in *Lee*: "the assumption that because someone shares characteristics – many of them innocent and commonplace – with a certain type of offender, that individual must also possess the same criminal culpability." *Lee*, 191 Ariz. at 545, ¶ 14, 959 P.2d at 802 (faulty reasoning that a defendant's knowledge can be shown by the consistency of his

actions with a drug courier profile). Here, the agents did not compare the actions and circumstances of Defendant to the "profile" of a drug courier. Rather, it was left to the jury to decide whether the circumstances surrounding Defendant's apprehension and the modus operandi of drug trafficking organizations supported an inference that Defendant was transporting drugs for such an organization.

¶25 Defendant argues, however, that Agent Curiel's testimony that he was apprehended in a high drug traffic area was improperly admitted as profile evidence. We disagree. Agent Curiel's testimony simply explained, by way of background, the reason why he was watching the area when he first observed Defendant's smuggling group. *See Lee*, 191 Ariz. at 545, ¶ 11, 959 P.2d at 802 (noting that profile evidence has been used as background for a police stop and search); *United States v. Gomez-Norena*, 908 F.2d 497, 501 (9th Cir. 1990) (same).

¶26 Additionally, Defendant contends Agent Dawson's testimony that "marks" are frequently found on drug traffickers he has arrested was also inadmissible profile evidence. We conclude there was no error. Agent Dawson's testimony provided background as to why he took photographs of Defendant, which in turn led to his observation that Defendant had marks on his shoulders and back that were consistent with carrying "something very heavy." This evidence was not profile evidence, nor was it modus operandi evidence. It was simply circumstantial evidence that Defendant may have been carrying one of the abandoned marijuana backpacks.

¶27 Accordingly, we find no error in admitting the agents' testimony, and conclude that Defendant has not met his burden of showing the trial court committed fundamental reversible error. *See Henderson*, 210 Ariz. at 567-68, ¶¶ 20, 22, 26, 115 P.3d at 607-08.

## III. Closing Argument

¶28 In his closing argument, the prosecutor emphasized that the area where Defendant was found is a well-known drug trafficking area. He reiterated that the types of packs initially shown on the infrared equipment and eventually found by the agents are unique to people trafficking drugs. He also stated that individuals found in the desert who are not transporting drugs are typically found with personal belongings such as food and water.

¶29 The prosecutor did not argue in his closing that a drug-courier profile existed, nor did he make any comparison between a drug

courier profile and Defendant. However, he did describe how the actions of Defendant fit into the modus operandi of a drug trafficking organization. We find no error in this argument. While the agents themselves could not, in the context of their expert testimony, make such a comparison, there was nothing improper about the prosecutor arguing reasonable inferences to the jury based on the expert testimony of the officers. *State v. Bible*, 175 Ariz. 549, 602, 858 P.2d 1152, 1205 (1993) (holding that prosecutors "may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions"); *see also United States. v. Sanchez-Hernandez*, 507 F.3d 826, 833 (5th Cir. 2007) ("Our cases criticize the admission of direct testimony of this type [profile evidence], but we have not held that the government cannot argue this inference when a defendant is entrusted with illicit drugs or is given a role in their distribution and claims that he did not know that the drugs were present or was duped into playing a role in their movement."); *cf. State v. Loney*, 230 Ariz. 542, 545, ¶¶ 10, 13, 287 P.3d 836, 893 (App. 2012), *vacated in part on other grounds*, *State v. Loney*, 231 Ariz. 474, 296 P.3d 1010 (App. 2013) ("Loney argues the prosecutor's comments improperly asked the jury to find him guilty because he fit the sexual predator profile testified to by Officer Patterson. We disagree because the prosecutor's effort to draw comparisons between Loney and the sexual predator profile fell within the proper scope of closing argument . . . Because the prosecutor was permitted to argue all reasonable inferences based on the testimony of Officer Patterson, she could properly argue that Loney fit the profile of a sexual predator.").

### Cost of DNA Testing

¶30        Defendant argues he should not have been required to pay the cost of his DNA testing. The State concedes that the court's order requiring Defendant to pay for his DNA testing was erroneous and must be vacated. *See State v. Reyes*, 232 Ariz. 468, 472, ¶ 14, 307 P.3d 35, 39 (App. 2013). We agree and vacate the portion of the sentencing order requiring Defendant to pay for his DNA testing.

**Conclusion**

**¶31** For the reasons discussed above, we affirm Defendant's conviction and sentence as modified to vacate the portion of the court's sentencing order requiring Defendant to pay for his DNA testing.



Ruth A. Willingham · Clerk of the Court
FILED: MJT