NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

STANLEY CHARLES WHIPPLE, *Appellant*.

No. 1 CA-CR 25-0012

FILED 03-02-2026

Appeal from the Superior Court in Maricopa County
No. CR2023-007962-006
The Honorable Todd F. Lang, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael T. O'Toole
*Counsel for Appellee*

Maricopa County Office of the Legal Advocate, Phoenix
By Christine Jones
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Angela K. Paton joined.

---

**P E R K I N S**, Judge:

¶1 Stanley Whipple appeals his convictions and sentences for one count of promoting prison contraband and one count of transportation or sale of narcotics. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2 On May 16, 2022, prison surveillance footage captured inmate Whipple leaving his cell at 2:00 a.m. for his work shift in the prison's kitchen, carrying an opaque white cup with a black lid. At 2:39 a.m., Whipple went out of camera view with the cup. He reentered camera view a few minutes later, still holding the cup, accompanied by a prison guard. That guard immediately released Whipple from the kitchen, and another guard escorted him back to his cell. Whipple entered his cell with the cup while the guard stood by the door. Whipple came out a few seconds later, holding a back brace and a visibly different cup without a black lid. The guard locked the cell door and escorted Whipple back to the kitchen to finish his shift.

¶3 Whipple alone resided in the cell. Two corrections officers searched Whipple's cell at 7:43 a.m. that same morning. The surveillance footage showed that no one entered Whipple's cell from when he left earlier that morning to when the officers conducted the search. During the search, the officers found the opaque white cup with a black lid, containing five bindles (a law enforcement term for narcotics packaging) of what appeared to be narcotics wrapped in electrical tape. They photographed the cup and seized the bindles. Four of the bindles tested positive for heroin and weighed about 7.5 ounces together—an approximate value of over $50,000.

¶4 The State charged Whipple with one count of promoting prison contraband and one count of transportation or sale of narcotics, both class two felonies. Whipple's first trial resulted in a mistrial when the jury could not reach a verdict.

¶5            The State tried Whipple again on both counts. During both trials the State introduced the relevant surveillance footage, testimony from corrections officers, and testimony from a detective with nearly a decade of experience investigating narcotics in prisons. The detective testified that a drug mule often wraps narcotics in electrical tape and brings them into prison in a body cavity. The mule then gives the drugs to a courier in a common location like a visitation area, kitchen, or warehouse. The courier gives the drugs to the main supplier, who sells them to wholesalers who then sell to users. He testified that couriers always get paid, and in a variety of ways, such as, through commissary items, wire transfers, or deposits to their inmate bank account. Often they get a cut of the drugs, and trade those drugs for anything of value, for example, food or time playing a video game. But he found nothing in Whipple's emails, phone calls, visit logs, or inmate bank accounts that indicated Whipple had been paid for trafficking drugs. Finally, he testified that 7.5 ounces was an unusually large amount of heroin, which signals that it was for sale.

¶6            At the close of evidence in both trials, Whipple requested a *Willits* instruction because the State failed to preserve the cup in which the heroin was found. A *Willits* instruction informs jurors that they may infer from the State's loss or destruction of material evidence that the evidence would have been unfavorable to the State. *State v. Willits*, 96 Ariz. 184, 191 (1964). The court declined to give the instruction, finding that Whipple had not shown the cup was material or that it was likely to exonerate him.

¶7            The court instructed the jury that for the promoting prison contraband count, it had to find that Whipple "knowingly took contraband into a correctional facility or the grounds of such facility." The prosecutor argued that although Whipple did not take the heroin into the prison himself, he was an accomplice of a drug mule who did.

¶8            On the transportation or sale of narcotics count, the court instructed the jury that it had to find that Whipple (1) "knowingly transported a narcotic drug for sale," (2) "sold a narcotic drug," or (3) "transferred a narcotic drug." In closing, the prosecutor invited the jury to convict Whipple if it found any one of the three bases. The prosecutor then clarified that the only dispute was whether Whipple "knowingly transported [] the heroin for sale or transferred it."

¶9            The jury returned guilty verdicts on both counts. After an aggravation phase, the jury declined to find the pecuniary-gain aggravating circumstance. The court imposed a minimum sentence of 14 years

imprisonment on both counts to run concurrently. Whipple appealed, and we have jurisdiction. A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033(A).

**DISCUSSION**

**¶10** On appeal, Whipple argues the court erred by (1) failing to define "transfer" in the jury instructions; (2) denying the *Willits* instruction; and (3) denying his motion to strike a prospective juror.

**I. Failure to define "transfer" in the jury instructions**

**¶11** We review for fundamental error because Whipple did not request that the trial court define "transfer" in the jury instructions. *See State v. Rushing*, __ Ariz. __, __, ¶ 50, 573 P.3d 72, 88 (2025). We do not reverse based on a showing of fundamental error unless the defendant establishes resulting prejudice. *See State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018).

**¶12** Whipple argues that the jury may have understood "transfer" and "transport" to mean the same thing and thus could have convicted him on the "transport for sale" basis without finding the "for sale" element. At oral argument, the State conceded that the failure to define "transfer" was error but maintained that it was not prejudicial. Given the parties' agreement as to error, and because the question of prejudice is dispositive, we assume without deciding that error occurred.

**¶13** To establish prejudice, Whipple "must show that a reasonable jury could have reached a different result had the jury been properly instructed." *State v. James*, 231 Ariz. 490, 494, ¶ 15 (App. 2013) (cleaned up). More specifically, he must show that the jury could have acquitted him on the "for sale" element. To answer that question, we consider the context of the case, "including the evidence at trial, the defense offered, and the parties' arguments to the jury." *Id.*

**¶14** The "for sale" element of "transport for sale" may be proven by purely circumstantial evidence, such as the quantity and packaging of the drugs. *State v. Arce*, 107 Ariz. 156, 160 (1971). The State met that burden by introducing Detective Pruitt's testimony that the heroin in Whipple's cell was worth over $50,000 and that such a large quantity indicated the heroin was for sale.

**¶15** Whipple argues the jury could have acquitted him on the "for sale" element because the State presented no direct "evidence that he was compensated," nor any "communications related to sales." True, Detective Pruitt testified that he reviewed Whipple's emails, phone calls, visit logs,

4

and inmate bank accounts and found nothing showing that Whipple was involved in trafficking drugs. But that does not cast doubt on the State's theory because the heroin was seized before Whipple could sell it, so no payment would be expected.

**¶16** Critically, Whipple never explained to the jury why he would have transported the heroin other than to sell it. Instead, he argued that he did not transport the heroin at all. With no argument or evidence supporting a different motive for Whipple transporting the heroin and ample evidence that he did so for sale, a reasonable jury could not have found that Whipple transported but did not intend to sell the heroin. Whipple's speculation cannot establish prejudice. *See State v. Crain*, 250 Ariz. 387, 397, ¶ 33 (App. 2021) (A defendant cannot establish prejudice by speculating that the jury could have returned a different verdict had the court given the proper instruction).

**¶17** Whipple contends that the jury's refusal to find the pecuniary-gain aggravating factor shows that it would not have found the "for sale" element if properly instructed. The pecuniary-gain aggravator required the jury to find that Whipple "committed the offense(s) as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." *See* A.R.S. § 13-701(D)(6). The court defined "pecuniary value" as "money or property." "Sale" in "transport for sale" is statutorily defined as "an exchange for anything of value or advantage, present or prospective," not necessarily money or property. A.R.S. § 13-3401(32).

**¶18** Because the definition of "pecuniary value" is narrower than "value" in the sales sense, a reasonable jury can convict a defendant of "transportation for sale" and then decline to find the pecuniary-gain aggravator. Those dual findings are reasonable in a case like this, because nothing suggested the drugs were transported for any reason other than "for sale." At the same time, evidence showed that drugs are commonly exchanged for non-monetary value, such as food or time playing a video game. And Whipple argued that nothing showed he received any "money" and there are "other reasons" to traffic drugs "beyond pecuniary gain." Given this record, a reasonable jury could have found the "for sale" element while declining to find the pecuniary-gain aggravator.

**¶19** Finally, Whipple argues we should disregard some of Detective Pruitt's testimony in evaluating prejudice because it constituted impermissible drug-courier profiler evidence. We do not agree that any of the detective's testimony was impermissible.

¶20 Expert testimony about general behaviors is permitted if it helps the jury's understanding of the evidence. *Escalante*, 245 Ariz. at 143, ¶ 25. The State can introduce drug-courier profile evidence to help the jury understand the methods and operations of drug-trafficking organizations. *State v. Garcia-Quintana*, 234 Ariz. 267, 272, ¶ 23 (App. 2014). "But profile evidence cannot be used as substantive proof of guilt." *Escalante*, 245 Ariz. at 142, ¶ 22. For example, the *Escalante* court noted that an officer can testify that dryer sheets and coffee beans like those found in the defendant's possession are often used to mask the smell of drugs. *Id.* at 143, ¶ 25. But an officer cannot testify that possessing dryer sheets and coffee beans was consistent with drug trafficking. *Id.*

¶21 Here, the detective testified about the structure of drug-trafficking organizations generally and their methods for smuggling drugs into prisons. That testimony was permissible because he avoided any direct comparisons between Whipple's behavior and that of drug traffickers. *See Garcia-Quintana*, 234 Ariz. at 271, ¶¶ 14–15. And although the detective concluded that the large quantity of heroin found in Whipple's cell indicated that it was for sale, courts have allowed this type of testimony. *State v. Fornof*, 218 Ariz. 74, 79–80, ¶¶ 20–21 (App. 2008) (trial court properly "permit[ed] an expert to testify that he believed the quantity of drugs [the defendant] had possessed were for sale, rather than personal use"); *State v. Gonzalez*, 229 Ariz. 550, 553–54, ¶ 13 (App. 2012) ("Expert testimony that drug traffickers do not entrust large quantities of drugs to unknowing transporters is not drug courier profile evidence, but rather, is modus operandi evidence."). There was no error.

¶22 At bottom, because the jury found that Whipple transported over $50,000 of heroin into his cell and received no argument or evidence that it was not for sale, we conclude that a reasonable jury, in this context, could not have found that the heroin was not "for sale." *See James*, 231 Ariz. at 494, ¶ 15 (we determine prejudice based on the context of the case, including the evidence presented and the arguments made). The alleged jury instruction error was not prejudicial reversible error.

## II. Denial of a *Willits* instruction

¶23 Whipple argues the court erred by denying his requests for a *Willits* instruction in both trials based on the State's failure to preserve the cup found in his cell. We review the court's denial of a requested *Willits* instruction for an abuse of discretion. *State v. Glissendorf*, 235 Ariz. 147, 150, ¶ 7 (2014).

¶24 Generally, a court must give a *Willits* instruction if: (1) the state failed to preserve "obviously material" evidence that had a "tendency to exonerate" the defendant; and (2) prejudice resulted. *State v. Hernandez*, 250 Ariz. 28, 31, ¶ 10 (2020). Whipple argues the cup was obviously material and tended to exonerate him because if another inmate's name or fingerprints were found on the cup, it would show that someone else possessed the heroin. We disagree. The surveillance footage showed that Whipple brought a cup back from the kitchen and dropped it off in his cell, and that no one then entered his cell until the officers found a cup containing heroin. Someone else's name or fingerprints on the cup would not contradict the video evidence that he carried the heroin into his cell. All it would show is that he used someone else's cup to do so, or that someone else had previously touched the cup.

¶25 Whipple also argues that if the cup had another inmate's markings, such evidence would support his theory at trial that there was more than one cup and that he was set up. But he has not explained why someone planting heroin to set him up would plant it in a second cup with another inmate's markings on it rather than the cup that Whipple had just brought into his cell. The court did not abuse its discretion by declining to give a *Willits* instruction.

## III. Refusal to strike a prospective juror

¶26 During jury selection for Whipple's second trial, Juror 20's responses to the questionnaire suggested bias in favor of law enforcement. When the court and the attorneys questioned Juror 20, she disavowed her questionnaire responses and said she would treat a law enforcement officer's testimony the same as that of another person. But upon further questioning, Juror 20 noted that she "might be more inclined to believe the testimony of a law enforcement officer." The court asked: "[Y]ou're to consider the testimony of a police officer the same as any other person. Are you able to follow that jury instruction?" Juror 20 responded: "Yes." The court then asked: "Obviously some witnesses will have more credibility. Others will have less. But it's not because . . . they are or are not a police officer. Do you understand that?" Juror 20 responded: "Yes." Whipple moved to strike Juror 20. The court declined, finding that Juror 20 would follow the jury instructions.

¶27 Whipple argues that the court erred by refusing to strike Juror 20 because she exhibited bias in favor of law enforcement, which could not be overcome by one-word responses to leading questions by the court. We

review for an abuse of discretion. *State v. Montoya*, 258 Ariz. 128, 155, ¶ 72 (2024).

**¶28**　　　The trial court "must" strike a prospective juror if there is reason to believe that the juror cannot be "fair and impartial." Ariz. R. Crim. P. 18.4(b). Before striking a juror, the court and the attorneys may question the potential juror to explore potential bias. *State v. Colorado*, 256 Ariz. 97, 102, ¶ 21 (App. 2023). The questioning may rehabilitate the juror or strengthen the case for striking her. *Id.*

**¶29**　　　A comment to Rule 18.5(f) admonishes courts not "to rehabilitate prospective jurors by asking leading, conclusory questions that encourage prospective jurors to affirm that they can set aside their opinions and neutrally apply the law." Our Supreme Court noted, however, that "this comment does not strip away what the rule expressly provides by giving courts the discretion to manage voir dire." *Montoya*, 258 Ariz. at 152, ¶ 64 (cleaned up). Indeed, "when a prospective juror gives unclear or qualified answers on impartiality, Rule 18.5 authorizes the court to clarify the answers." *State v. Puga*, 259 Ariz. 229, 234, ¶ 22 (App. 2025). Ultimately, because the superior court is best "positioned to observe the potential juror, weighing her experiences, answers, and demeanor," we "defer to [the] court's credibility determinations," and question "only whether the record supports [its] findings." *Id.* at 234–35, ¶¶ 27–28.

**¶30**　　　Juror 20's responses to the questionnaire and subsequent questioning made it unclear whether she was biased toward law enforcement. The court thus had the discretion to ask her to clarify those answers. *See id.* at 234, ¶ 22. The court acted within that discretion by asking Juror 20 if she understood and could follow the instructions to treat the testimony of a law enforcement officer the same as any other person. Because she answered those questions affirmatively, the record supports the court's finding that she will "follow the jury instructions." We will not second-guess the court's exercise of its discretion based on its first-hand observations of Juror 20.

## CONCLUSION

¶31　　　　We affirm Whipple's convictions and sentences.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**: 　　　　JR